UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

UNITED STATES OF AMERICA                                                              PLAINTIFF

v.                                                              CRIMINAL ACTION NO. 3:11-CR-10-4-S

LUIS SALCIDO-GUZMAN                                                                 DEFENDANT

**FINDINGS OF FACT**
**CONCLUSIONS OF LAW**
**AND RECOMMENDATION**

**INTRODUCTION**

Defendant Luis Salcido-Guzman has filed a motion to suppress all evidence obtained as a result of the warrantless stop of a white cargo van in which he was riding as a passenger. Louisville Metro Police Department (LMPD) officers stopped the van on December 15, 2010, as part of an ongoing drug investigation, after it failed to signal a left-hand turn. Following the discovery of multiple bundles of marijuana in the van, and in another white cargo van operated by co-defendant Sandovar separately stopped at a different location that evening by LMPD officers, Salcido-Guzman was federally indicted along with ten other defendants for conspiracy to distribute 1,000 kgs or more of marijuana, and aiding and abetting one another to possess marijuana with intent to distribute it in violation of 21 U.S.C. § 846 and 841(b)(1)(A)(vii). Salcido-Guzman now argues that the officers involved in the traffic stop of the van in which he was a passenger lacked probable cause or reasonable suspicion to justify the warrantless stop. For this reason, he seeks to suppress all evidence obtained from the van or his person. The Court conducted a suppression hearing on July 26, 2011.[1] Salcido-Guzman and the United States have filed their post-hearing briefs. Accordingly, the matter is now ripe for

---

[1] Court reporter Dena Legg stenographically recorded the hearing.

consideration.

## FINDINGS OF FACT

LMPD Sgt. Tom Schardein testified on behalf of the Government at the hearing. Sgt. Schardein is a 12-year police veteran with extensive experience in narcotics investigations (DN 197, Transcript of Suppression Hearing (TSH), p.4-6). In October of 2010, Schardein was assigned to the LMPD Narcotics Intelligence Division, when he learned about Det. Eric Culver's investigation of an auto repair shop operated by brothers Yoany and Yankiel Cruz-Lopez at 1214 Outer Loop in Louisville, Kentucky. (TSH, p. 7-8). Sgt. Schardein first learned of the investigation after his supervisor approached him about Det Culver being attached to the Seventh Division to work on a major investigation (Id.).

Det. Culver advised Sgt. Schardein, Lt. Brandon and Det. Richard Bluemeier in a briefing that the Outer Loop location was being used as a "chop shop" for stolen automobiles and as a distribution point for various illegal drugs. (Id.). Specifically, Schardein learned from Culver that stolen vehicles were being transported from Florida to the 1214 Outer Loop address where cloned VIN numbers removed from other wrecked automobiles were being substituted for the VIN numbers on the stolen cars. (TSH, p. 9). The stolen cars were later resold using the cloned VIN numbers. (Id.). Illegal drugs such as cocaine, marijuana, and pills were being transported from Miami, Florida, to the Cruz-Lopez brothers' business to be distributed, as well.

On Thanksgiving Day, 2010, Sgt. Schardein and other LMPD officers conducted a surveillance of the business at 1214 Outer Loop based on information obtained from a confidential informant working with Det. Culver that a semi tractor-trailer shipment of drugs

would be arriving at the location. (TSH, p. 10-11). According to Schardein, the confidential informant had a significant criminal history, but had proven to be cooperative and reliable in the past. (Id.). Independent investigation had corroborated much of the information the informant provided. (TSH, p. 11, 46).

Based on the confidential informant's tip, LMPD officers including Sgt. Schardein set up surveillance on the 1214 Outer Loop property on Thanksgiving evening. No drugs were recovered by the police on that occasion, however. (Id, p. 45-46). A vehicle stop of one vehicle leaving the location resulted in a drug dog alerting on the automobile, but no drugs were found in the car on that occasion. (Id.).

On Dec. 15, 2010, Sgt. Schardein received a telephone call at his home from Det. Culver. Culver advised Schardein that the same confidential informant had just called him to say that a drug load was to be delivered at the Outer Loop auto repair shop of the Cruz-Lopez brothers that evening by tractor-trailer. (TSH, p. 12, 51). Sgt. Schardein immediately contacted LMPD Lt. Braden to advise him of the situation. (Id.). Det. Culver had already prepared a search warrant for the Outer Loop property that Sgt. Schardein in his role as supervisor had reviewed. (Id.). Because the police had intelligence that a suspect wanted on firearms charges might be living on the Outer Loop property, and the size of the property, the decision was made that the search warrant would be executed by the SWAT team of the LMPD. (TSH, p. 12-13).

LMPD Dets. Jilek and Boenlein began surveillance of the 1214 Outer Loop property, which is located on the south side of, and immediately adjacent to, the Outer Loop, an east-west highway. The property itself is bounded on three sides by a chain link fence and on the fourth side by a drainage ditch (TSH, p. 13-14, 62-63). Sgt. Schardein drove past the location on

3

his way to an organizational meeting with other LMPD officers at a nearby location on National Turnpike. (Id.) Another LMPD Det., Jeff Lee, took up a hidden position in the weeds near the property where he could directly observe events as they transpired and report them on the police radio to the other officers involved in the operation. (TSH, p. 14, 20). A single access road to the property passes underneath the Outer Loop.[2] (Id.).

Sgt. Schardein took up a position in a parking lot near the property after he left the meeting at the National Turnpike location. (TSH, p. 15). Schardein was not able to directly observe the property from where his green Jeep Cherokee was parked, however, due to obstructions between his line of sight and the location. (Id., p. 19). During this time, Det. Culver, who was to enter the property with the SWAT team, left the first meeting site with the search warrant he earlier prepared to have it signed by a Jefferson District Court judge. (Id., p. 17-18). The warrant was signed that same evening prior to the challenged vehicle stop (Id., p. 47). Schardein recalled that the weather that night was cold with a slight drizzle that quickly turned into a blowing freezing rain. (Id., p. 19). As the weather deteriorated, the number of cars on the Outer Loop decreased. (Id.). Throughout the evening the officers involved in the Outer Loop investigation maintained continuous radio contact with each other and Det. Lee on the LMPD tactical channel. (TSH, p. 16)

Sgt. Shardein did not directly observe the tractor-trailer on the Outer Loop property. The tractor-trailer had already arrived by the time that Shardein took up his position (Id., p. 21, 48). Det. Lee instead reported by radio that he observed that a tractor-trailer had

---

[2] The prior report and recommendation of the Magistrate Judge on the motions to suppress filed by defendants Alfredo Carrillo-Alvarado and Juan Landros-Sandovar also describes the location of the property.

4

backed up to the garage loading dock on the property. (Id., p. 52). Det. Lee observed a lot of activity around the truck with a forklift unloading what appeared to be heavy pallets from the back of the tractor-trailer. (Id.). Lee, however, could not discern from his position exactly what was being unloaded; nor could he see whether the contents of the tractor-trailer were being loaded into other vehicles. (Id., p. 52). He did observe, however, three or four men standing outside the gate to the property. (Id., p. 21, 54).

At the time, Sgt. Schardein assumed that these individuals were acting as lookouts and security for the smuggling operation. (Id.). Matters later revealed that the group actually was conducting its own surveillance in preparation for robbing the marijuana shipment later. (TSH, p. 21-22). These events were consistent with the information provided by Det. Culver's confidential informant. (Id., p. 23). According to Sgt. Schardein, 'Everything seemed to fit the pattern of what they'd been told." (Id.). The confidential informant had told Culver that once a drug shipment arrives at the Outer Loop property, it is immediately unloaded and broken down for distribution so that the drugs do not remain on the property for any significant length of time after their arrival. (TSH, p. 26, 59).

Det. Lee then reported over the radio that he observed a convoy of vehicles leaving the property. (TSH, p. 24). The convoy consisted of five vehicles: two white cargo vans and two mini-vans followed by a sedan. Sgt. Schardein advised over the radio that he would follow the first white cargo van. (Id.). This van was being followed by a maroon Toyota minivan with the two vehicles traveling in tandem together westward on the Outer Loop. (Id.). As they drove along with Sgt. Schardein following behind, he observed the two vehicles simultaneously change lanes and maintain their distance so that no other vehicles could drive

5

between them. (Id., p. 24-25).

Sgt. Schardein, based on his narcotics interdiction training, concluded that the maroon Toyota minivan was acting as a "chase" or "follow" vehicle for a load of drugs hidden in the white cargo van in front of it. (Id., p. 25). Sgt. Schardein explained at the hearing that such chase cars are used by drug dealers to follow a drug shipment to make sure that the drugs are safely transported to their destination and to act as a buffer should police arrive. (Id.). Based on the way that each of the two white cargo vans was each accompanied by a chase vehicle, Sgt. Schardein concluded that there were two loads of narcotics in the cargo vans. (Id., p. 26).

Sgt. Schardein followed the first cargo van as it drove from the Outer Loop onto Third Street Rd. (TSH, p. 28). Detectives Jilek and Boenlein followed behind him. (Id., p. 29). Sgt. Schardein noticed as he drove that the van and maroon minivan appeared to be driving slower than the other vehicles on the road, well below the posted speed limit. Schardein considered this circumstance to be suspicious, given the normal flow of traffic in the area. (Id., p. 28-29). As Sgt. Schardein watched, the white cargo van turned left from Third St. onto McNair without giving a turn signal in violation of Kentucky traffic laws. (TSH, p. 30).

Sgt. Schardein considered the McNair street location to be the perfect place for a traffic stop. (Id.). He radioed that he would stop the cargo van. To do so, Sgt. Schardein passed the Toyota minivan and pulled in front of it while activating his emergency lights. (Id., p. 31). The cargo van declined to stop, however, and continued to drive. (Id.). Sgt. Schardein concluded that the driver of the van must be having a "panic moment," a fight or flight moment. Consequently, he was concerned that the occupants of the van might try to obtain weapons or to destroy evidence as they drove. (TSH, p. 31-32). Schardein decided to use his Jeep as a blocking

6

vehicle. He pulled in front of the white cargo van and hit the brakes on his car, which forced the van to come to a stop. (Id, p. 32).

Sgt. Schardein jumped out of his Jeep and approached the driver's side of the white cargo van while Det. Jilek approached on the passenger side. (Id.). When he got within four feet of the cargo van, Sgt. Schardein smelled an overwhelming odor of fresh marijuana. (Id., p. 34, 39). Schardein had no doubt that what he smelled was marijuana. (Id.). Because the driver of the vehicle, Heraclio Ramos-Gonzalez, would not obey Schardein's commands to voluntarily exit, Sgt. Schardein pulled him out of the vehicle. (Id., p. 32-33, 37). The passenger in the cargo van, Defendant Luis Salcido-Guzman, also initially refused to obey police commands and had to be forcibly placed in handcuffs at the scene. (Id.).

Sgt. Schardein observed the van and noted that the back windows and side windows were covered with cardboard to prevent anyone from looking into the van. (Id., p. 33, 35). When Sgt. Schardein opened the sliding door on the passenger side of the van, two bales of marijuana sprung out and struck him because the van was so tightly loaded with marijuana. (Id., p. 33, 36). Sgt. Schardein called out his discovery of the marijuana. (Id.). At this time, both the former occupants of the van received a pat-down search for weapons. (THS, p. 40-41). The pat-down of Defendant Salcido-Guzman resulted in the discovery of some $500 in cash on his person. (Id., p. 56).

Sgt. Schardein testified that the traffic violation he witnessed immediately prior to the stop was not the crucial event that led to the stop, although it was "helpful" in his view. (Id., p. 39, 57). Det Culver previously determined that evening that all vehicles exiting the Outer Loop property would be stopped based on the belief that they were involved in illegal drug

7

distribution. (Id., p. 50). In Schardein's own mind, other articulable facts that gave rise to reasonable suspicion included the tandem driving of the white cargo van and chaser vehicle, their unusually slow driving speed below the posted speed limit, and their refusal to allow any vehicle to come between them on the road. (TSH, p. 39-40). These facts, independently of the traffic violation that arose from the failure to signal a left turn, convinced Sgt. Schardein that reasonable suspicion existed to make an investigative *Terry* stop of the white cargo van that Salcido-Gizman was a passenger in and the trailing maroon minivan.

Sgt. Schardein acknowledged that when he initially wrote his after action report he put the wrong name for the passenger of the white cargo van. (TSH, p. 41). After speaking with LMPD detective Waters, Sgt. Schardein's corrected his error. (Id., p. 42-43). During the suppression hearing, Sgt. Schardein positively identified Defendant Salcido-Guzman as being the passenger in the cargo van at the time of the stop that evening. (TSH, p. 42, 55).

Sgt. Schardein acknowledged on cross-examination that police made no controlled drug buys prior to the vehicle stop on Dec. 15, 2010. Police did not directly observe any of the defendants engage in any illegal drug sales. No one saw contraband being loaded into any of the five vehicles that left 1214 Outer Loop that evening, and no one observed Defendant Guzman loading or unloading any of the vehicles. (Id., p. 56). In fact, police were not aware that Defendant Salcido-Guzman was in the cargo van until after the traffic stop when he was removed. (Id., p. 55). Schardein also agreed that no weapons were recovered by police that evening.

8

**CONCLUSIONS OF LAW**

The sole question put before the Court is whether a lawful basis existed under the Fourth Amendment to perform a warrantless stop of the cargo van in which Defendant Salcido-Guzman was riding. Defendant Guzman insists that no reasonable suspicion existed to justify Sgt. Schardein's warrantless stop, much less probable cause. The stop, according to Salcido-Guzman, was predetermined. Sgt. Schardein knew that a directive had been given to stop all vehicles that departed from the 1214 Outer Loop property that evening. Accordingly, the cargo van occupied by Guzman would be stopped no matter what information that Schardein or any other officer had available. What information was available, according to the Defendant, was entirely innocuous.

The Magistrate Judge has recently discussed constitutional law that relates to warrantless vehicle stops in connection with several suppression motions filed by Defendant Guzman's co-defendants in this criminal case. Specifically, the Court addressed the Fourth Amendment principles surrounding investigative vehicle stops in its prior report and recommendation on the two motions to suppress filed by Defendant Carrillo-Alvarado and Landros-Sandovar, respectively. (DN 90, 104 ). The Court now reiterates these principles[3].

The general Fourth Amendment principles of search and seizure law that govern investigative stops are well established. *United States v. Vite-Espinoza*, 342 F.3d 462, 466-67 (6th Cir. 2003) ("The generally applicable principles of search and seizure jurisprudence are well-known and settled."). A warrantless traffic stop is to be analyzed as an investigative detention

---

[3] Because the Court ultimately determines that reasonable articulable suspicion existed to perform a *Terry* stop of the cargo van, the automobile exception to the warrant requirement is not addressed in this report and recommendation.

9

under the principles of *Terry v. Ohio*, 392 U.S. at 9. *United States v. Wilson*, 506 F.3d 488, 492 (6th Cir. 2007) ("'An ordinary traffic stop is like an investigated detention, the scope of which is governed by *Terry* principles.'") (quoting *United States v. Perez*, 440 F.3d 363, 370 (6th Cir. 2006). Under *Terry*, a warrantless stop for questioning will be held to be reasonable if "'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'"). *Vite-Espinoza*, 343 F.3d at 466 (quoting *Terry*, 392 U.S. at 21-22)).

The standard for reasonable suspicion under *Terry* is an objective one. *Id*. It requires that the detaining officers "'have a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *United States v. Johnson*, 620 F.3d 685, 692 (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). In determining whether such reasonable suspicion exists, the reviewing court is to look to the totality of the circumstances in place at the time of the seizure. *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *United States v. McCauley*, 584 F.3d 440, 443 (6th Cir. 2008). No fact is to be analyzed in isolation. *United States v. Williams*, 615 F.3d 567, 666 (6th Cir. 2010); *United States v. Martin*, 289 F.3d 392, 397 (6th Cir. 2002) ("[C]ourts do not separately scrutinize each factor relied on by the officer conducting the search.") Consequently, a series of acts that independently may appear innocent, when taken together can justify further investigation. *Arvizu*, 534 U.S. at 274.

Officers in conducting such an investigation are fully entitled to draw upon their professional experience and specialized training to draw inferences from and make deductions about the cumulative information available to them, information that might well seem entirely innocuous to the untrained eye. *United States v. Perez*, 440 F.3d 363, 371 (6th Cir. 2006). Among the facts that an officer may fully consider in the totality of the circumstances is the

presence of a suspect in an area of expected criminal activity at an unusual hour. Such circumstances by themselves are not sufficient, however, to support a reasonable, particularized suspicion. *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000); *United States v. Caruthers*, 458 F.3d 459, 467-68 (6th Cir. 2006).

Other examples of the type of circumstances that the investigating officers may take into consideration are the officers' own direct observations, information received from police dispatch, directions or information from other police officers involved in the investigation, as well as the area and time of day during which the suspicious activities occurred. *United States v. Pearce*, 531 F.3d 374, 380 (6th Cir. 2008); *Dorsey v. Barber*, 517 F.3d 389, 395 (6th Cir. 2008).

What is important in this regard is the collective information available to the officers at the time of the warrantless stop itself. *United States v. Torres-Ramos*, 536 F.3d 542, 552 (6th Cir. 2008), *cert. denied*, *Rahburn v. United States*, 129 S.Ct. 772 (2008); *Feathers v. Aey*, 319 F.3d 843, 848-49 (6th Cir. 2003) (totality of the circumstances involves consideration of "all of the information available to law enforcement officials at the time"). The Court in considering this totality of the circumstances will review the evidence offered in support of reasonable suspicion "using a commonsense approach as understood by those in the field of law enforcement." *United States v. Richardson*, 385 F.3d 625, 630 (6th Cir. 2004) (citing *Cortez*, 449 U.S. at 417-18).

The Government bears the burden to prove by a preponderance of the evidence the existence of a reasonable suspicion to believe, based on objective and articulable facts, that the Defendants were engaged in criminal activity at the time of the warrantless investigative stop. *Torez-Ramos*, 536 F.3d at 552. Certainty of criminal activity need not be shown in order

for a suspicion to be objectively reasonable under the Fourth Amendment. *United States v. Flores*, 571 F.3d 541, 545 (6th Cir. 2009) ("but law enforcement officers need not have certainty in order for a suspicion to be reasonable"). In fact, the level of suspicion necessary for a warrantless investigative stop is relatively minimal and "considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Sokolow*, 490 U.S. 1, 7 (1989). While an inchoate or unparticularized suspicion or hunch will not suffice, so long as articulable facts reasonably suggest that criminal activity "may be afoot," even though the officers involved lack probable cause for the challenged investigatory stop, such stop will be constitutionally reasonably under *Terry*. *Id*.

The analytical framework of *Terry* requires that courts also address a related question about the degree of intrusion once a suspect has been lawfully stopped. *See, United States v. Campbell*, 549 F.3d 364, 370-72 (6th Cir. 2008). In other words, a lawful *Terry* stop must not only be justified at the point of its inception, but additionally must be "reasonably related in scope to the circumstances which justified the interference in the first place." *Id*. (citing *Blair*, 524 F.3d at 750). The investigative detention must last no longer nor be more intrusive than is necessary to carry out the purpose of the stop otherwise a temporary investigative stop will become an arrest that must be supported by probable cause. *Dorsey*, 517 F.3d at 398; *United States v. Garcia*, 496 F.3d 495, 504 (6th Cir. 2007). *See also, Torres-Ramos*, 536 F.3d at 551-52 ("If the detention is proper, then the second question is 'whether the degree of intrusion ... was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officers' conduct given their suspicions and surrounding circumstances.") (citing *United States v. Caruthers*, 458 F.3d at 464).

Safety concerns are an integral factor in *Terry* stop situations. *Campbell*, 549 F.3d at 371-72. For example, a legitimate concern for officer safety will permit the police to order the driver and passenger out of a stopped vehicle. *Id*. When a reasonable suspicion exists that such individuals may be armed and dangerous, the officer may conduct a pat-down search as well. *Id*. The officers involved are likewise permitted to ask the detained individuals a moderate number of questions in order to determine their identity and to confirm or to dispel the officer's reasonable suspicions. *United States v. Butler*, 223 F.3d 368, 374 (6th Cir. 2000). The critical question for this portion of the *Terry* analysis is whether a reasonably prudent officer in the same circumstances would be warranted in believing that his or her safety or that of the public is in danger. *United States v. Campbell*, 486 F.3d 949, 955 (6th Cir. 2007). With these standards in mind, the Court turns to the facts as they existed at the time that the white cargo van and Toyota minivan were stopped on the evening of Dec. 15, 2010.

**Factual Analysis**

Information available to Sgt. Schardein at the time of the stop revealed the following credible facts. First, a confidential informant who was determined by independent investigation to have provided accurate information advised Det. Culver that a semi tractor-trailer load of marijuana was to be delivered that evening at the auto repair shop at 1214 Outer Loop. Independent investigation through drive-by and direct surveillance revealed that the informant's information was correct - - a semi tractor-trailer was seen on the property. This tractor-trailer was directly observed backing up to the garage. From his position hidden in the weeds near the property, Det. Lee could observe a forklift being used to unload objects from the

13

rear of the tractor-trailer. The confidential informant had advised police that upon arrival at 1214 Outer Loop drug shipments were quickly broken down and did not remain on the property long. With this information, Det. Lee reported observing a convoy of vehicles leaving 1214 Outer Loop along the sole access road to the property.

The convoy Lee observed consisted of two white cargo vans with each van being closely followed by a mini-van vehicle. Sgt. Schardein considered this circumstance to be significant given his training in drug interdiction. His interdiction training taught that large drug shipments are quickly broken down into smaller amounts for distribution. Further, the use of a cargo vehicle accompanied by a chase vehicle is a common feature in illegal drug transportation scenarios. The chase vehicle acts as a blocking vehicle to provide security for the vehicle that transports that drugs.

Sgt. Schardein followed the cargo van and could observe that the windows of the van appeared to be covered in cardboard to prevent anyone from looking into the interior of the passenger compartment. Also, the van and chase vehicle were not driving the posted speed limit for the area, but were driving below the speed limit, another circumstance that Sgt. Schardein considered to be suspicious. Finally, there was the fact that the cargo van initially would not stop when Sgt. Schardein activated his emergency equipment on McNair street. Sgt. Schardein testified that he concluded that the driver of the cargo van was having a panic "fight or flight" moment due to the initial refusal of the van to stop. Based on all of these circumstances, Sgt. Schardein concluded that a reasonable suspicion existed sufficient to make an investigative *Terry* stop of the vehicle, apart from the traffic law violation he had directly observed when the van failed to signal its intention to turn left onto McNair.

The Court agrees that a reasonable suspicion of ongoing drug-related criminal activity existed at the time of the stop on Dec. 15, 2010. The 1214 Outer Loop location had been the subject of an ongoing police investigation, which revealed the likely presence of an auto chop-shop and drug distribution ring. Information provided by a reliable confidential informant indicated that a large shipment of marijuana would be arriving by tractor-trailer on the evening of the vehicle stops. In fact, LMPD officers confirmed the presence of a tractor-trailer on the property that evening and that it was being unloaded by forklift. The officers knew from the confidential informant that once a drug shipment arrived at the Outer Loop property it was quickly broken down for resale and removed from the property.

As the Court noted in its prior recommendation involving the warrantless stop of the other white cargo van, the facts of the present case are similar in their nature to those discussed in *United States v. Flores*, 571 F.3d 541, 544-45 (6th Cir. 2009). In *Flores*, the Sixth Circuit upheld a warrantless vehicle stop under *Terry*. The officers in *Flores* had conducted a lengthy investigation into the suspected illegal drug activities of defendant Spragling, whom police believed to be the leader of a major drug trafficking ring. *Id*. at 544. Officers had received information from a confidential source and had conducted extensive surveillance, wire taps and controlled drug buys. *Id*. This investigation led the officers to learn the location of a suspected drug stash house known as "The Spot." *Id.*

The investigating officers received information from wire intercepts that a drug delivery was about to take place at The Spot. They observed an unfamiliar jeep parked in the driveway of the house at the time of the scheduled delivery. *Id*. Even though the officers did not have a description of the driver of the vehicle, defendant Flores, nor were they aware of exactly

15

the length of time that Flores had been at the residence, the Court nonetheless held that given the totality of the information available through the investigation, the law enforcement officers were entitled to perform a warrantless stop of the jeep after it left the location of the suspected stash house based on information concerning the drug delivery. *Id*. at 545.

In this regard, the Sixth Circuit held that

> But law enforcement officers need not have certainty in order for a suspicion to be reasonable. The standard is whether they are "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." *Terry*, 392 U.S. at 21 ... Based on the information that the agents had gained from their investigation, they reasonably believed that a drug delivery was about to take place at "The Spot." which the agents had previously identified as the Delos Street address. They could also reasonably infer that Flores was there to make the scheduled delivery, even though it was theoretically possible that he was there for some innocent purpose. The agents had more than 'an ill-defined hunch' that the Jeep parked at "The Spot" on the evening of Dec. 15, 2005, was there for an illicit purpose; they could point to specific and articulable facts supporting their belief that the driver of the unfamiliar vehicle was there to complete a drug delivery. We thus conclude that the District Court did not err in denying Flores's motion to suppress the evidence against him.

*Flores*, 571 F.3d at 545 (parallel citations omitted). *See also, United States v. Soto*, 591 F.2d 1091, 1099 (5th Cir. 1979) (warrantless stop of two vans traveling in tandem from site of suspected marijuana delivery was justified where officers were aware that marijuana was to be delivered to two beach houses from which the vans departed, the vans traveled in tandem at night and appeared to be heavily laden); *United States v. Juarez,* 408 Fed. Appx. 183, 187-88 (10th Cir. Jan. 28, 2011)(confidential informant's tip that 500 lbs of marijuana had been delivered to suspect's apartment and would be transported by a white van, combined with officers observation of the same van being loaded with garbage bags and traveling in tandem with blue

pick-up truck, as predicted by informant, established sufficient reasonable suspicion to stop the vehicles and arrest the van driver after officer's smell strong odor of marijuana coming from the van).

**Traffic Law Violation.**

Even if the Court were to conclude that a reasonable suspicion of drug-related criminal activity did not exist at the time Sgt. Schardein stopped the white cargo van, the result of this report and recommendation would not be materially altered. Sgt. Schardein had a separate, independent basis on which to stop the white cargo van on Dec. 15. Sgt. Schardein directly observed the van commit a traffic violation when it failed to indicate its intention to turn left with the required turn signal prior to making the turn. This obvious traffic violation entitled Sgt. Schardein to immediately stop the cargo van. *See, United States v. Street*, 614 F.3d 228, 232 (6th Cir. 2010) ("When law enforcement officers witness a traffic violation, they may stop the driver and his car.").

Such stops are entirely lawful "and there is nothing 'unreasonable' about stopping a vehicle whose driver has just committed a traffic violation.'" *Id*. (citing *Whren v. United States*, 517 U.S. 806, 810 (1996). Kentucky law plainly requires that a turn signal be rendered a minimum of 100 ft. prior to a vehicle making a turn. *See,* KRS 189.380(2) ("A signal indicating the intention to turn right or left shall be given continuously for not less than the last one hundred (100) feet traveled by the motor vehicle before the turn."). While such a routine traffic violation might not ordinarily result in the arrest of the driver, or any penalty other than a traffic citation, these circumstances do not deprive the police or Sgt. Schardein of the authority to stop

the cargo van. *See, Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977) (upholding the stop of a vehicle to issue a traffic summons for driving with an expired license plate); *Virginia v. Moore*, 553 U.S. 164, 176 (2008) (upholding the constitutionality of the arrest of a driver for a nonarrestable traffic violation). Further, the fact that all of the vehicles departing from 1214 Outer Loop that evening were subject to being stopped as part of the drug investigation does not affect the lawfulness of the traffic stop, as Sgt. Schardein's subjective state of mind in conducting the traffic stop is irrelevant so long as probable cause exists to believe that a traffic violation did occur. *Whren*, 517 U.S. at 813; *Street*, 614 F.3d at 232. Accordingly, the warrantless stop of the white cargo van by Sgt. Schardein was entirely lawful.

The same is true of the removal from the cargo van and the arrest of both the driver and the passenger, Defendant Salcido-Guzman. Upon approaching the vehicle, Sgt. Schardein smelled a distinctive odor of fresh marijuana emanating from the vehicle. Schardein testified that he had no doubt that what he smelled was marijuana based on his training and experience. In *United States v. Garza*, 10 F.3d 1241, 1246 (6th Cir. 1993), the Sixth Circuit held that the reasonable articulable suspicion of a police officer to stop a defendant's vehicle developed into probable cause to search the vehicle when, upon approaching it, the officer detected the odor of marijuana. *See also, United States v. Awolowo*, 2010 Wl 55327 at *5 (E.D. Tenn. Jan. 4, 2010) ("The Court of Appeals has consistently held that a police officer's detection of the odor of marijuana emanating from within a vehicle is sufficient to provide probable cause to conduct a warrantless search of that vehicle for marijuana.").

Also, the law is settled that police officers in such situations may legitimately ask the occupants of the stopped vehicle to exit the car. *Mimms*, 434 U.S. at 111. Because traffic

18

stops are "fraught with danger to police officers," *Michigan v. Long*, 436 U.S. 1032, 1047 (1983), officers at the scene of a traffic stop have the discretion to conduct an otherwise lawful stop so as to ensure their safety by requiring the occupants of the stopped vehicle to step out of the car. *Maryland v. Wilson*, 519 U.S. 408, 415 (1997). Thus, Sgt. Schardein and Det. Jilec acted reasonably in removing the occupants of the cargo van after they refused to exit the vehicle or otherwise cooperate. The officers also were reasonable in their decision to detain both men to ensure their safety given the prior information concerning the possibility of weapons. The occupants' lack of cooperation coupled with the subsequent discovery of a substantial amount of packaged marijuana when Sgt. Schardein opened the sliding side door to the van clearly established probable cause to arrest the driver and Defendant Salcido-Guzman. *See United States v. Bradshaw,* 102 F.3d 204, 212 (6th Cir. 1996)(discovery of marijuana and a handgun in vehicle passenger compartment of automobile stopped for traffic violation provided probable cause to arrest the defendant). For all of the above reasons, the Magistrate Judge shall recommend that the motion to suppress filed by Defendant Luis Salcido-Guzman be denied.

**RECOMMENDATION**

The Magistrate Judge having made findings of fact and conclusions of law recommends that the motion to suppress filed by Defendant Luis Salcido-Guzman be **DENIED**.

## **NOTICE**

Within fourteen (14) days after being served a copy of these proposed Findings and Recommendation, any party who wishes to object must file and serve written objections or further appeal is waived. *Thomas v. Arn*, 728 F.2d 813 (6th Cir. 1984), *aff'd,* 474 U.S. 140 (1985). 28 U.S.C. § 636(b)(1)(c); Fed.R.Civ.P. 72(b).

Copies to Counsel of Record